**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 13, 2019
Decided November 26, 2019

**Before**

WILLIAM J. BAUER, *Circuit Judge*

MICHAEL B. BRENNAN, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

No. 19-1399

| | |
|---|---|
| PATRICK J. DUNN, <br>     *Plaintiff-Appellant*, | Appeal from the United States District Court for the Northern District of Illinois. |
| *v.* | No. 17-cv-8068 |
| ANDREW M. SAUL, <br> Commissioner of Social Security, <br>     *Defendant-Appellant*. | Jeffrey T. Gilbert, <br> *Magistrate Judge*. |

**O R D E R**

Patrick Dunn seeks Social Security disability benefits, claiming that he became disabled from memory loss in September 2012 at age 58. Before 2012, he worked at various jobs, including as a bank manager and in retail sales. But his employment records show that he struggled with memory loss and headaches that impeded his job performance until he could no longer work. An administrative law judge denied Dunn's application for disability benefits on the ground that his cognitive limitations were not "severe," and the district court affirmed. We cannot conclude that substantial evidence supports the ALJ's decision. Foremost, the ALJ altogether failed to consider

Dunn's employment records and did not explain why he rejected testimony about how Dunn's memory struggles affected his daily activities and social interactions.

**I**

Dunn attributes the start of his cognitive decline to a traumatic head injury he experienced in 1990, when he fell down a flight of stairs. He sustained a head contusion and concussion, and a physician diagnosed him with "post-concussion syndrome" shortly after. Dunn did not receive further brain evaluation or treatment until April 2014, when he injured his head again. A CT scan of his brain revealed "[a]bnormal density … involving the inferior aspect of the right frontal lobe as described likely [result] of remote trauma" and "show[ed] evidence of old traumatic injury … consistent with [Dunn's] history of remote head trauma." Treating physicians diagnosed him with a forehead abrasion and head contusion.

Later that month, Dunn applied for disability benefits, claiming that he had not been able to work since 2012. Dr. Glen Wurglitz, a state-retained physician, performed a psychological exam. Dunn told Dr. Wurglitz that he suffered from chronic headaches and worsening memory problems. He explained that he tried to manage his headaches with non-prescription pain medicine, but then had to stop working in 2012 because of worsening memory loss. At home, Dunn could manage only light housework. Dr. Wurglitz nonetheless concluded that Dunn could "readily concentrate on a task until it is finished," had no problems expressing himself, and had "excellent" short-term memory. The agency denied his application for disability benefits, and Dunn requested a hearing before an ALJ.

Before the hearing, Dunn sought an evaluation and treatment from a neurologist, Dr. Zoran Grujic, for progressive cognitive decline. Dr. Grujic examined Dunn and found that he had encoding and retrieval difficulties. He diagnosed Dunn with "mild cognitive impairment," chronic daily headaches, and a history of traumatic brain injury. He also opined that "[a]ging on top of an old brain injury may account for the progressive nature of [Dunn's] symptoms" and ordered a brain MRI, which revealed "right frontal encephalomalacia." (Encephalomalacia is an abnormal softness or loss of brain tissue after a head injury.) After reviewing the MRI results, Dr. Grujic confirmed his diagnosis of "mild cognitive impairment." He added that Dunn's low vitamin B12 level and insomnia might have contributed to his cognitive difficulties.

At the hearing before the ALJ, Dunn testified that he suffered from memory shortfalls at home and work. He explained, for example, that he destroyed several pots

and pans because he would forget that he was cooking and burn the bottoms. His daughter had to call him daily to remind him to take his medications and to eat. He also often forgot where he was going, so much so that he missed appointments. At work, his memory problems caused his performance to gradually deteriorate until he was fired from his job at Harris Bank in 2005. Between 2005 and 2012, Dunn worked other jobs but struggled to maintain long-term employment because he could not remember his schedule. He was disciplined repeatedly because his forgetfulness continued to interfere with his job performance. Eventually, in 2012, he stopped working.

To corroborate his testimony about memory deficits, Dunn submitted his employment records from 2010 to 2012—the last two years of his employment history, when he worked as a retail sales supervisor at Bon-Ton. The records show tardiness and absenteeism for which Dunn received 30 reprimands in 18 months, as well as failures to follow instructions and complete tasks. So, too, do the records trace a decline in work performance, culminating in a rating of "unacceptable" performance in 2012.

Two other witnesses testified at the ALJ hearing. Dunn's daughter explained that he moved in with her because he was struggling to live on his own. Although she had hoped Dunn would be able to care for her children, he often lost their clothes, forgot to bathe them and change their diapers, and missed their medical appointments. She also confirmed Dunn's account that he forgot to eat and take his medicine without daily reminders, and that, unless she took him to medical appointments, he missed them. A vocational expert opined that a person with Dunn's asserted limitations and record of absenteeism and tardiness would be unemployable.

Applying the five-step analysis mandated by agency regulations for assessing disability, *see* 20 C.F.R. § 404.1520, the ALJ determined that Dunn was not disabled. Dunn's application failed at step two, where the ALJ found that Dunn's cognitive impairment was not "severe." After characterizing Dunn's testimony about the intensity, persistence, and limiting effects of his symptoms as "not entirely consistent" with the record, the ALJ rated him in the four functional areas for assessing the severity of a mental disorder. *See* 20 C.F.R. § 404.1520a. The ALJ found that Dunn had (1) "no limitation" in the area of daily living because he could bathe, dress, make meals, and care for his grandchildren; (2) "no limitation" in the area of social functioning because he enjoyed activities with family and friends and had no history of depression or suicidal ideation; (3) "mild limitations" in the area of concentration, persistence, or pace because he had excellent short-term memory, could readily concentrate on a task until completion, and was able to manage his own money; and (4) no decompensation. To

reach this assessment, the ALJ gave "great weight" to Dr. Grujic's diagnosis of a mild cognitive impairment because he was a treating physician and his diagnosis was consistent with the record. The ALJ gave only "some weight" to Dr. Wurglitz's assessment because he did not see the full medical record and only "some weight" to Dunn's daughter's testimony because she was not a medical professional.

Dunn sought review of the ALJ's decision in district court, where a magistrate judge presided by consent. He argued that the ALJ failed to properly assess his employment records, his medical evidence, and his testimony about his symptoms. The district court affirmed the ALJ's denial of his disability benefits.

## II

We will vacate a decision to deny disability benefits if it is not supported by substantial evidence or if the ALJ did not adequately discuss the issues and evidence involved in the claim. *See Meuser v. Colvin*, 838 F.3d 905, 910 (7th Cir. 2016); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011); *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2008).

Dunn first contends that, in finding that he did not have a "severe" cognitive impairment, the ALJ impermissibly disregarded his employment records from Bon-Ton. We agree. These records span almost two years, show chronic tardiness, absenteeism, and incomplete work, and support Dunn's testimony that his failing memory inhibited his ability to continue working. Yet the ALJ did not mention them. Although under no obligation to address every piece of evidence in the record, *see Villano*, 556 F.3d at 562, an ALJ may not ignore an entire line of evidence contrary to his ruling. *See Meuser*, 838 F.3d at 912. The ALJ here was free to consider Dunn's employment records and expressly decide that they deserved little weight, but to disregard them completely was impermissible. Because the records appear to confirm Dunn's testimony that his cognitive decline rendered his ability to work "unacceptable," the ALJ needed to at least address and evaluate them. *See, e.g.*, *Villano*, 556 F.3d at 563; *Meuser*, 838 F.3d at 912.

The Commissioner urges that no law required the ALJ to discuss these employment records, and that the ALJ could not have used them to infer that cognitive impairments caused Dunn's workplace problems. But the regulations require the agency to consider an applicant's employment records in assessing the severity of a claimant's mental impairment. *See* 20 C.F.R. Part 404, Subpart P, App. 1, § 12.00(C) (explaining that the Administration evaluates evidence from work and work-related programs in assessing the severity of mental impairments). Ruling SSR 16-3p likewise

requires an ALJ to consider "the entire case record, including … information provided by medical sources and *other persons*; *and any other relevant evidence in the individual's case record*" in determining the severity of an impairment. SSR 16-3p, 2016 WL 1119029, at *4 (Mar. 16, 2016) (emphasis added); *see also* 20 C.F.R. § 404.1529(a) (explaining that the agency considers both "objective medical evidence and other evidence" in evaluating whether an impairment affects activities of daily living and the ability to work). Even more, Dr. Grujic noted that Dunn's impairments "affected his work." From this statement, the ALJ could have inferred that Dunn's "unacceptable" work record resulted from his memory loss. On this evidence, the ALJ was not free to deny Dunn's application for benefits without addressing the information in and takeaways available from his work records.

Dunn also argues that, in assessing his functional limitations as required by the Social Security regulations, the ALJ erred by ignoring any evidence contrary to his decision. Here, too, we agree with Dunn. The functional assessment insufficiently addressed three areas. *First*, in concluding that Dunn had "no limitation" in the area of daily living, the ALJ did not explain why he rejected the testimony from both Dunn and his daughter that Dunn missed medical appointments, forgot about pots and pans on a burning stove, and overlooked household chores, meals, and daily medications. *Second*, in finding that Dunn had "no limitation" in the area of social functioning, the ALJ did not assess his daughter's testimony that Dunn had no friends and could not adequately care for her children. *Third*, in ruling that Dunn had only "mild limitation" in the area of concentration, persistence, and pace, the ALJ did not address whether Dunn's employment records confirmed his testimony that his cognitive decline rendered his work unacceptable.

To be sure, the ALJ acknowledged that Dunn's "statements concerning the intensity, persistence, and limiting effects" of his symptoms were "not entirely consistent" with other evidence in the record. But we discourage the use of boilerplate without a more thorough explanation of which evidence is inconsistent with the applicant's testimony and why. *See Pepper v. Colvin*, 712 F.3d 351, 367–68 (7th Cir. 2013). Likewise, under the agency's own policy statements, an ALJ cannot simply say that "statements about the individual's symptoms are (or are not) supported or consistent" with the record. SSR 16-3p, 2016 WL 1119029, at *9. Here the ALJ did not explain which aspects of Dunn's testimony he rejected and why. Moreover, the ALJ's explanation that he discounted the daughter's testimony because she was not a medical professional does not adequately explain his decision to give little weight to her testimony. Her

observations that Dunn forgot his meals, medicine, appointments, and caregiving duties concern daily living and did not require a professional degree.

One more aspect of the ALJ's decision warranted further elaboration. In determining whether an impairment is severe, the agency uses five terms to describe functional limitations: "none, mild, moderate, marked, and extreme." *See* 20 C.F.R. § 404.1520a(c)(4). Recall that Dr. Grujic had also used the term "mild" in diagnosing Dunn's cognitive impairment. But "mild" in that context means something different. Dr. Grujic relied on the Diagnostic and Statistical Manual of Mental Disorders, which classifies "neurocognitive disorder due to traumatic brain injury" with only two ratings, "mild" or "major." *Neurocognitive Disorders*, DSM-V (2013). Even in its "mild" form, the disorder causes "reduced cognitive efficiency, difficulty concentrating, and lessened ability to perform usual activities." *Id.* Furthermore, Dunn's underlying traumatic brain injury was not rated but may have caused additional functional limitations. *Id.* The ALJ omitted any explanation of how Dr. Grujic's terminology connected to the agency's definitions in Dunn's case, as the regulations require. *See* 20 C.F.R. § 404.1527(d)(2).

In combination, these errors warrant remanding for further proceedings. The ALJ omitted any mention of Dunn's employment records and cited only the portions of his and his daughter's testimony that downplayed his daily impediments. According to the vocational expert, someone with Dunn's asserted impairments is unemployable. Because the ALJ did not address or weigh this evidence, Dunn's disability benefits application merits reconsideration.

We therefore VACATE the judgment and REMAND to the agency for further proceedings.