NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued March 1, 2011
Decided March 25, 2011

**Before**

MICHAEL S. KANNE, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

DIANE P. WOOD, *Circuit Judge*

No. 10-3119

| | |
|---|---|
| LONALD HEEMAN, *Plaintiff-Appellant,* | Appeal from the United States District Court for the Central District of Illinois |
| *v.* | No. 09-3184 |
| MICHAEL J. ASTRUE, Commissioner of Social Security, *Defendant-Appellee.* | Charles H. Evans, *Magistrate Judge.* |

**O R D E R**

Lonald Heeman has suffered for years from debilitating back pain and depression. In September 2004, he applied for disability insurance benefits and supplemental security income pursuant to the Social Security Act, 42 U.S.C. §§ 421, 423. After the state agency turned him down, he requested a hearing before an administrative law judge. There too he was unsuccessful, and the Appeals Council denied his request for agency review. He then filed an action in the district court for review under 42 U.S.C. § 405(g). Acting with the consent of the parties, see 28 U.S.C. § 636(c), a magistrate judge heard the case and found

that the agency's decision was supported by substantial evidence. Although this was the correct standard of review, we find too many gaps to permit endorsement of the ALJ's result, even under this deferential standard. We therefore reverse and remand the case to the agency for further proceedings.

## I

### A. Back Pain

Heeman has had problems with his back for a long time. In 1998, he underwent a lumbar laminectomy that was successful for a time in relieving his pain. But on July 18, 2001, while at work, he re-injured himself, causing pain that began in his back and radiated down his right side through his right leg. From that time until the present, he has seen a progression of doctors who have tried in a great number of ways to alleviate the severe pain that he experiences. At times their efforts have had some positive effect, but overall nothing has had a lasting impact. Heeman also suffers from severe depression, which has led him to self-mutilate and to experience suicidal ideation. To give a flavor of what he has been through, we recount some (but not all) of his medical history.

Immediately after his injury, Heeman went to the emergency room for treatment. The doctor there did not take an x-ray or an MRI; he concluded instead that Heeman had experienced only a lumbar strain and prescribed a pain reliever and a muscle relaxer. Several months later, Heeman began attending physical therapy sessions at the recommendation of a Dr. Holt. He received temporary relief from this treatment, but in October 2001 he was back in the emergency room complaining of pain and numbness down his back and right leg. The doctor who saw him prescribed a different pain reliever and an antispasmodic. Around the same time, treatment notes from his primary-care physician, Dr. Marshall Robert, indicate that Heeman consulted Dr. Koteswara Narla, a neurologist. Dr. Narla administered an epidural steroid injection for the back pain.

In November and December 2001, Heeman returned to Dr. Robert, complaining again that pain was shooting down his back and his right leg. Dr. Robert diagnosed him with spondylolisthesis (a forward slipping of the vertebra) and a herniated disc. Dr. Robert wrote in his notes that Dr. Holt had recommended a number of work restrictions, including that Heeman should not lift more than 10 pounds, sit more than 50% of the time, or engage in repetitive back bending. At the time, Heeman was apparently working for Dot Foods as a "chaser." (The ALJ noted in his opinion that Heeman's past relevant work was "as an industrial truck operator, construction worker, landscape gardener, hand packager, and fertilizer mixer.") At that time, Dot had already placed Heeman on light duty. In December 2001, at Dot's request, Heeman visited another doctor, who also diagnosed

spondylolisthesis and degenerative disc disease.

During 2002, Heeman attended physical therapy sessions, continued to see Dr. Robert for pain medication, and on one occasion went to the emergency room where he received some kind of injection for his pain. He tried working as a dishwasher at a bar, but he quit after a week when he developed numbness in his hands. In November 2002, Dr. Robert ordered an MRI of Heeman's cervical spine; the test revealed a disc bulge and disc protrusion that seemed to be compressing the spinal cord. In April 2003, Dr. Robert referred Heeman to Dr. Claude Fortin, a pain specialist, who diagnosed him with "low back pain syndrome" and gave him three epidural steroid injections and a nerve blocker. Heeman returned, however, still complaining of back pain. Dr. Fortin thought that Heeman's response to the injections suggested nerve root irritation, but the doctor reported that there was a "paucity" of objective findings.

Nevertheless, in 2004 Dr. Fortin gave Heeman another epidural injection and ordered another MRI. The results of that MRI were similar to those of the earlier one. Dr. Fortin wanted Heeman to get a second opinion from Dr. Narla; Dr. Fortin also commented that he thought that Heeman had "somewhat exaggerated pain behaviors." Only methadone seemed to be helping.

As ordered, Heeman returned to Dr. Narla, who first reviewed the MRI and found nothing too remarkable. But Heeman was still complaining of pain, and so Dr. Narla decided to take more dramatic steps. He inserted a trial spinal stimulator, which is a device that sends electric pulses to the spinal cord to relieve pain. But the stimulator did not work either, and so Dr. Narla removed it after three days. In July 2005, Heeman returned to Dr. Narla complaining that his pain was worse than ever (ranging from a 7 to a 10 on a 10-point scale). Dr. Narla prescribed morphine and an antidepressant.

B. Mental Status

In the meantime, Heeman's mental health was also deteriorating. On May 24, 2005, he had a psychological evaluation with Dr. Kujoth, to whom he reported that he had difficulty sleeping. Dr. Kujoth also observed that his ability to concentrate and think abstractly was impaired. In August 2005, Heeman sought treatment at Mental Health Centers of Central Illinois (MHCCI). Personnel there administered the Global Assessment of Functioning (GAF) tests, and concluded that his score was a 45. (Heeman notes in his brief, without contradiction from the Commissioner, that a GAF score of 50 or below indicates "[s]erious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social occupational or school functioning (*e.g.*, no friends, unable to keep a job). DSM-IV-TR.") After that initial visit, Heeman went several times a

month to the MHCCI. Counselors there observed his evident pain. He admitted having suicidal thoughts to them, and in February 2006 he told his counselor that he was cutting himself on his forearm to cope with the pain. The arm was covered in a checkered pattern of superficial cuts. Continued GAF testing through 2006 produced consistently low results: March 30 (score of 50); June 8, July 24, August 4 (scores of 50); August 3 (score of 55). On two occasions (October 11, 2007, and January 3, 2008), he scored as high as 60.

## C. Daily Activities

Heeman's daily activities were limited. He has a twelfth-grade education, the nature of which caused some confusion at the hearing. He obtained his high school diploma by taking a course through the mail; it was his understanding that this was a diploma, not a GED. At the time of the hearing on February 5, 2008, he was 43 years old; he lived with his wife and his 15-year-old daughter in a mobile home. His wife, who supports the family with a job as a checker, drove him to the hearing. The drive was about an hour long, but she stopped twice along the way. Heeman's medications "take the edge off" his pain, but at least one leaves him feeling drowsy and dizzy. Heeman still has a driver's license, but he drives only 10 miles on average in a week. He has no hobbies or activities, and he needs help getting into and out of the bathtub. His cooking is limited to making a sandwich. He can fold clothes, but he cannot take them out of the dryer. Generally speaking, he contributes very little to the ordinary chores around the house.

## II

After reviewing evidence from Heeman and a number of physicians and mental health workers, the ALJ concluded that he was not disabled. Before engaging in the required five-step sequential evaluation, see 20 C.F.R. §§ 404.1520(a) and 416.920(a), the ALJ first found that Heeman met the insured status requirement of the Act through June 30, 2004. At step one of the analysis, the judge found that Heeman had not engaged in substantial gainful activity since July 18, 2001, his alleged onset date; at step two, the judge agreed that he had two severe combination of impairments, degenerative disc disease and depression, and that these impairments "more than minimally" affected his ability to function. At step three, the judge decided that Heeman's impairments did not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. This required the ALJ to move on to step four, at which the question is whether the claimant is able to perform his past relevant work. The ALJ concluded that Heeman could indeed perform his past work as a fertilizer mixer, and so there was no need to consider step five, which shifts the burden to the Commissioner to show that there is work in the national economy that the claimant can perform.

The ALJ reviewed the evidence that we have outlined above. In rejecting Heeman's claim, he found the following problems with the evidence. First, he found an overall lack of "objective medical evidence" that would explain the degree of pain that Heeman reported. Second, he thought that Heeman had contradicted himself during the hearing:

> When challenged, he would take some time to think about how to answer the question. In doing so, he claimed to be confused because of his medications. However, during the bulk of the hearing, he showed few signs of confusion as he stayed mentally engaged in what was happening. While complaining about his back, for which he rotated a number of times between sitting and standing, he leaned over the microphone while standing. He did this a number of times and stayed leaned over for significant periods while he answered questions. This is not in keeping with the allegations he made about having a bad back. The claimant also testified that he could only sit or stand for 30 minutes and that he could only rotate between the two for 60 to 90 minutes. However, his trip to the hearing was an hour. He waited for his hearing. It lasted an hour and he had another hour to get home. This is more than three hours of not lying down.

The judge also criticized Heeman for contradicting himself about his educational background, thinking that at one point Heeman said he left school in the tenth grade, but at another point that he had a high school diploma. But Heeman had tried to explain that he received a "real" diploma, not a GED, after he took the correspondence course. At worst, there was a misunderstanding here; we see nothing contradictory in the testimony. The ALJ also minimized Heeman's psychological problems. The judge wrote that Heeman did not have any evidence of suicide attempts or hospitalizations for a psychological crisis. He did not mention Heeman's self-mutilation or his records from the MHCCI. With respect to concentration, the judge noted that Heeman was "capable of driving," but he did not mention the extremely limited nature of the driving Heeman does (one two-mile round trip five days a week).

### III

In our view, the ALJ erred in several respects: his mistaken insistence that the "objective" medical signs had to corroborate Heeman's reports of pain; his failure to take into account not only Heeman's repeated efforts to obtain relief from his pain, but also the serious responses of the doctors Heeman saw; and finally his failure to address critical evidence about Heeman's depression. In a case very similar to this one, where a claimant had back pain that was hard to pinpoint to a particular physical condition, we wrote that "[m]edical science confirms that pain can be severe and disabling even in the absence of 'objective' medical findings, that is, test results that demonstrate a physical condition that

normally causes pain of the severity claimed by the applicant." *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004). Quoting with approval from an Eleventh Circuit opinion, we wrote that "[a] claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability. Indeed, in certain situations, pain alone can be disabling, even when its existence is unsupported by objective evidence." *Id.*, quoting from *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995); see also *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006); *Bentley v. Shalala*, 52 F.3d 784, 786 (8th Cir. 1995).

Heeman's case, like many, does not present the extreme situation of pain entirely unsupported by physical evidence; instead, the ALJ was questioning only whether he might be experiencing the degree of pain he reported from his diagnosed degenerative disc disease and spondylolisthesis. As we commented in *Carradine*, what is significant here (as there) is the improbability that Heeman would have undergone all the procedures he did, including the trial insertion of the spinal stimulator, his physical therapy, and his heavy medications, just to create the impression that he was experiencing pain. *Carradine*, 360 F.3d at 755; see also *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 646 (7th Cir. 2007). Nor is it probable that Heeman could have fooled his many doctors, not to mention the mental health staff at MHCCI, for such a long time.

The ALJ also should not have relied so heavily on Heeman's posture during the hearing. Because this was a video hearing, the ALJ was not even in the same room with Heeman, and so his ability to observe was limited. The judge seems to have assumed that Heeman sat comfortably in the car while his wife drove for an hour to get to the place of the hearing. But, unlike most people, Heeman could not, and did not, sit still for the full hour; the two had to stop twice on the way. The ALJ had no personal knowledge of Heeman's behavior on the way home. Affidavits he and his wife submitted to the Appeals Council reveal that the ALJ's assumption was incorrect, and that Heeman had to lie down in the back seat for the entire trip home because of his pain.

The ALJ's comment that Heeman did not point to any emergency room visits or hospitalizations for pain was also erroneous. During the hearing, Heeman testified that he had been to the emergency room the night before for his neck pain. He submitted hospital records to the Appeals Council documenting this visit. After the hearing, he also went to the emergency room a few times. His doctor noted that "the Duragesic patch is the only pain medication that we can safely use that does not have a potential to be a mechanism for suicide."

Lastly, the ALJ's opinion does not adequately explain why the judge placed such little weight on the evidence of Heeman's depression. Apart from the concern his pain

doctors had with the risk of suicide, which we have just mentioned, there was substantial evidence of the paralyzing effect that Heeman's depression had. He testified that he thinks of suicide every day. The judge did not address Heeman's practice of cutting himself, which is hardly normal behavior. Three or four days a week, Heeman said, he gets dressed but then he goes back into his room, gets undressed, and stays home the rest of the day, unable even to pick up his daughter from school. He locks himself in a room for half a day and cries. And finally, his GAF scores have been consistently low, peaking at 60, but more often in the 50 to 55 range.

Both because the ALJ apparently relied on evidence that did not support his conclusions (*e.g.*, Heeman's trip to the hearing, his behavior there, his limited driving, his testimony about his education, and the lack of physical causes of his pain) and also because the ALJ did not adequately explain why he was rejecting substantial evidence of disability based on both pain and depression, the judgment of the district court affirming the denial of benefits is REVERSED and the case is REMANDED to the Social Security Administration for further proceedings consistent with this order.